UNITED STATES DISTRICT COURT
DISTRICT OF NEW JERSEY

| | |
|---|---|
| ESTATE OF JOHN SCHROEDER by and through DAWN TUCKER, ADMINISTRATRIX,<br><br>    Plaintiff,<br><br>    v.<br><br>PORT AUTHORITY TRANSIT CORPORATION, *et al.*,<br><br>    Defendants. | Case No. 22–cv–01208–ESK–EAP<br><br>OPINION |

**KIEL, U.S.D.J.**

    This matter is before the Court on the motion to dismiss filed by defendants Port Authority Transit Corporation (PATCO) and Delaware River Port Authority (DRPA) for lack of subject matter jurisdiction (Motion). (ECF No. 60.) The issue presented in the Motion is whether PATCO operates a railroad or an urban rapid transit system. I find that PATCO is an urban rapid transit system and not a common carrier by railroad. Plaintiff, therefore, cannot rely on the Federal Employers' Liability Act, 45 U.S.C. §§ 51 *et seq.*, (FELA) for subject matter jurisdiction. Accordingly, I will grant the Motion.

## PROCEDURAL BACKGROUND

    "PATCO is a wholly owned subsidiary of the DRPA." (ECF No. 60–4 ¶ 4.) The DRPA operates the PATCO Speed Line, a "rapid transit passenger" system running between Philadelphia, Pennsylvania and Lindenwold, New Jersey. (*Id.* ¶ 5.)

    John Schroeder was killed while working for PATCO at its Lindenwold Yard. (ECF No. 1 ¶¶ 1, 2.) Dawn Tucker, as the administratrix of his estate,

filed the complaint on March 4, 2022. The complaint asserts claims: (1) under FELA, the Federal Locomotive Inspection Act (LIA), and the Federal Safety Appliances Act (FSAA); (2) for negligence; and (3) for wrongful death. (ECF No. 1.) Defendants filed an answer on May 5, 2022. (ECF No. 10.) On December 22, 2022, defendants filed their first motion to dismiss (ECF No. 27) along with a motion to stay discovery pending resolution of the first motion to dismiss (ECF No. 28). Former District Judge Noel Hillman entered an order on May 17, 2023 permitting jurisdictional discovery to proceed and denying the first motion to dismiss without prejudice. (ECF No. 48.)

On January 12, 2024, defendants filed the present Motion. (ECF No. 60.) On February 20, 2024, plaintiff filed an opposition to the Motion (ECF No. 66), to which defendants filed a reply on February 27, 2024 (ECF No. 68).

## LEGAL STANDARD

A motion under Federal Rule of Civil Procedure (Rule) 12(b)(1) "attacks the right of a plaintiff to be heard in Federal Court." *Doughty v. U.S. Postal Serv.*, 359 F. Supp. 2d 361, 364 (D.N.J. 2005) (quoting *Cohen v. Kurtzman*, 45 F. Supp. 2d 423, 428 (D.N.J. 1999)). "When subject matter jurisdiction is challenged under Rule 12(b)(1), the plaintiff must bear the burden of persuasion." *Kehr Packages, Inc. v. Fidelcor, Inc.*, 926 F.2d 1406, 1409 (3d Cir. 1991). "[T]here are two types of Rule 12(b)(1) motions: those that attack the complaint on its face and those that attack subject matter jurisdiction as a matter of fact." *Petruska v. Gannon Univ.*, 462 F.3d 294, 302 n.3 (3d Cir. 2006); *see also Const. Party of Pa. v. Aichele*, 757 F.3d 347, 357–59 (3d Cir. 2014) (discussing the differences between facial and factual attacks on subject matter jurisdiction).

"The defendant may facially challenge subject matter jurisdiction by arguing that the complaint, on its face, does not allege sufficient grounds to establish subject matter jurisdiction." *D.G. v. Somerset Hills Sch. Dist.*, 559 F.

2

Supp. 2d 484, 491 (D.N.J. 2008). On a facial attack, "the court must consider the allegations of the complaint as true." *Mortensen v. First Fed. Sav. & Loan Ass'n*, 549 F.2d 884, 891 (3d Cir. 1977).

"A defendant can also attack subject matter jurisdiction by factually challenging the jurisdictional allegations set forth in the complaint." *D.G.*, 559 F. Supp. 2d at 491. Upon a factual attack, the court need not presume the truth of the allegations and "is free to weigh the evidence and satisfy itself as to the existence of its power to hear the case." *Mortensen*, 549 F.2d at 891. Therefore, when considering a factual challenge, a court is "not confined to the allegations in the complaint … and can look beyond the pleadings to decide factual matters relating to jurisdiction." *Cestonaro v. United States*, 211 F.3d 749, 752 (3d Cir. 2000).

Here, Judge Hillman determined that "[d]efendants' challenge to subject matter jurisdiction is a factual attack, allowing this Court to weigh and consider evidence outside of the pleadings." (ECF No. 48 p.4.) I agree and see no reason to disturb Judge Hillman's decision.

## **DISCUSSION**

Plaintiff asserts that this Court has original jurisdiction over this matter pursuant to its FELA claim.[1] "FELA provides the exclusive source of recovery for employees of interstate railroads injured or killed during the course of their employment." *Felton v. Se. Pa. Transp. Auth.*, 757 F. Supp. 623, 626–27 (E.D. Pa.), *aff'd*, 952 F.2d 59 (3d Cir. 1991). FELA was enacted on "Congress's recognition that human injury was 'an inescapable expense of railroading.'

---

[1] While violations of LIA and FSAA are also asserted, they do not provide a private right of action. *Newton v. Norfolk S. Corp.*, No. 05–01465, 2008 WL 55997, at *7 (W.D. Pa. Jan. 3, 2008). Plaintiff's claims for wrongful death and negligence are brought under state law. Therefore, in considering federal question jurisdiction, my analysis is limited to FELA.

It[s] goal was to shift that expense equitably from worker to carrier." *Id.* at 627 (quoting *Sinkler v. Mo. Pac. R.R. Co.*, 356 U.S. 326, 329–30 (1958)).

To recover under FELA, a plaintiff must establish: (1) "that the defendant is a common carrier by railroad engaged in interstate commerce"; (2) that the plaintiff was "employed by the defendant and assigned to perform duties which furthered such commerce"; (3) that the plaintiff's "injuries were sustained while … employed by the common carrier"; and (4) that the "injuries resulted from the defendant's negligence." *Felton*, 952 F.2d at 62; *see also* 45 U.S.C. §51 (setting forth the liability of common carriers engaged in interstate commerce for damages to individuals injured while employed by such carrier).

"There is a distinction between railroads which are covered by FELA and urban rapid transit systems which are not covered by FELA." *Linetskiy v. N.Y.C. Transit Auth.*, 2 A.D.3d 503, 504 (2003); *see also Felton*, 952 F.2d at 62 (noting that the "legislation affecting commuter railroad transportation … reveals a consistent congressional intent to distinguish between" railroads and urban rapid transit systems). The parties agree that FELA does not cover urban rapid transit systems.

"Railroad" is not defined in FELA. Accordingly, I must "construe [the term] in accordance with its ordinary meaning," considering "definitions of the term, the statutory context, and the case law." *United States v. Husmann*, 765 F.3d 169, 173 (3d Cir. 2014) (quoting *Octane Fitness, LLC v. ICON Health & Fitness, Inc.*, 572 U.S. 545, 553 (2014)).

## I. RAILROAD VERSUS URBAN RAPID TRANSIT SYSTEM

A "railroad" is "[a] road or way on which iron or steel rails are laid for wheels to run on, for the conveyance of heavy loads in cars or carriages propelled by steam or other motive power." *Railroad*, Black's Law Dictionary (2nd ed. 1910). Railroads typically "extend from town to town and are usually connected with other railroads, which themselves are further connected with

others, so that freight may be shipped … across the continent." *Strykowski v. Ne. Ill. Reg'l Commuter R.R. Corp.*, No. 93–2724, 1994 WL 287395, at *7 (7th Cir. June 28, 1994) (quoting *Omaha & Council Bluffs Street Ry. Co. v. Interstate Com. Comm'n,* 230 U.S. 324, 335–36 (1913)). "[U]rban rapid transit systems are within the tradition of the street railway," and are thus "local … [and] laid … for the use of a single community, even though that community [may] be divided by state lines, or under different municipal control." *Id.* (quoting *Omaha & Council Bluffs Street Ry. Co.*, 230 U.S. at 335–36).

The distinction between a railroad and urban rapid transit system can be "explained … in terms of the functions and services performed." *Id.* at *6. Courts, in making the distinction, have focused on whether the transit system is significantly engaged in interstate freight operations and whether it is physically integrated with designated railroads. *See, e.g.*, *Ferguson v. Phila. Transp. Co.*, 113 F. Supp. 275, 275 (E.D. Pa. 1952), *aff'd*, 205 F.2d 520 (3d Cir. 1953); *Felton*, 952 F.2d at 60; *Felton*, 757 F. Supp. at 632; *Linetskiy*, 2 A.D.3d at 504. While there is no definitive test or list of factors, I find the agency decisions and cases cited by defendants, which consider transit systems comparable to PATCO, to be instructive.

## II. HISTORY AS A PASSENGER TRANSIT SYSTEM

On July 4, 1926, the Delaware Joint River Commission opened the Delaware River Bridge [2] that spanned the Delaware River and connected Philadelphia and Camden. (ECF No. 60–3 p.9.) In 1936, the Delaware Joint River Commission opened a transit line across the Delaware River Bridge called the "Bridge Line." (*Id.* p.10.) This first iteration of what is now PATCO had two stops in Camden and two stops in Philadelphia. (*Id.*) The Philadelphia Rapid Transit Company operated the Bridge Line. (*Id.*) Later, the

---

[2] Since 1955, the bridge has been known as the Benjamin Franklin Bridge.

5

Philadelphia Transportation Company took over operations of the Bridge Line. (*Id.* p. 10, 11.)

When the DRPA was created in 1952, its certificate of incorporation tasked it with

> [t]he establishment, maintenance, rehabilitation, construction and operation of a rapid transit system for the transportation of passengers, express, mail, and baggage, or any of them, between points in New Jersey … and points within the City of Philadelphia, Pennsylvania, and intermediate points. Such system may be established by utilizing existing rapid transit systems, railroad facilities, highways and bridges within the territory involved and by the construction or provision of new facilities where deemed necessary, and may be established either directly by purchase, lease or contract, or by lease or agreement with any other public or private body or corporation, or in any other manner.

(ECF No. 60–2 p. 2.) Through an agreement with the Philadelphia Transportation Company, the DRPA oversaw the Bridge Line. (ECF No. 60–3 pp. 9–14.) In 1967, with the goal of expanding the Bridge Line, the DRPA created PATCO, a wholly-owned subsidiary of the DRPA. (*Id.* p. 21.) On February 15, 1969, PATCO first ran from Lindenwold to Philadelphia, which is its span today. (*Id.* p. 22.) The Bridge Line and PATCO have operated as a passenger transit system that does not carry freight. (*Id.*; ECF No. 60–4 ¶ 38.)

Presently, PATCO is a double-tracked transit line, running approximately 14.5 miles, from 16th and Locust Streets in Philadelphia to Lindenwold, New Jersey. (ECF No. 60–4 ¶ 6.) Traveling west to east, PATCO runs underground in Philadelphia for 1.7 miles. (*Id.*) It then crosses the Benjamin Franklin Bridge for 1.5 miles and then runs underground again in Camden for 0.6 miles, and finally runs aboveground for the remaining 10.7 miles to

Lindenwold.[3]  (*Id.*)  PATCO has four stops in Philadelphia and nine stops in New Jersey.  (*Id.* ¶ 7.)

At PATCO's Lindenwold facility, there is a portion of track called the Lindenwold Spur.  This spur was designed for the transportation of freight for PATCO's use.  (ECF No. 60–5 pp. 7, 15; ECF No. 60–7 p. 7.)  It, however, does not have a history of such use.  (ECF No. 60–5 p. 13.)  Plaintiff notes of a single instance, over ten years ago, when this spur was used while PATCO was doing maintenance on power poles and electrical cables.  (ECF No. 66 pp. 19, 20.)  Plaintiff argues that "[i]f we call the power pole equipment 'freight,' then in that sense, there has been misrepresentation by the [d]efendants to the extent they suggest 'freight' has never shipped on a PATCO rail."  (ECF No. 66 p. 20.)  I, however, find PATCO's single use of the Lindenwold Spur over ten years ago to transport equipment to be inconsequential to resolving the Motion.

Although PATCO operates interstate, with four stops in Pennsylvania and nine stops in New Jersey (ECF No. 60–4 ¶ 7), "the extension of urban transit lines across state boundaries does not convert a subway or street railway into a 'common carrier by railroad.'"  *Felton*, 757 F. Supp. at 627.  While urban rapid transit systems "carry[ing] passengers across a state line … are, of course, engaged in interstate commerce," case law establishes that the commerce Congress had in mind when legislating FELA referred to freight.  *Strykowski*, 1994 WL 287395, at *7 (quoting *Omaha & Council Bluffs Street Ry. Co.*, 230 U.S. at 335–36)); *Linetskiy*, 2 A.D.3d at 504 (noting that the Long Island Rail Road was classified as a railroad involved in interstate commerce and

---

[3] The length of a transit line is not relevant to whether it is a common carrier by railroad or an urban rapid transit system. *Ferguson*, 113 F. Supp. at 276 ("An examination of the authorities which have considered the question of whether street railway companies may be brought under the regulation of the [FELA] … hold that the length of its road or its track is not [to] be considered controlling in the determination of whether the Act is applicable.").

transportation of freight while the New York City Transit Authority "carrie[d] only passengers"). Transit systems that are not significantly engaged in interstate freight operations have been deemed urban rapid transit systems. *Ferguson*, 113 F. Supp at 276 (explaining that while the Philadelphia Transportation Company operates interstate, because "[n]o freight or mail is carried on any part of [its] system," it is not a common carrier railroad subject to FELA); *Linetskiy*, 2 A.D.3d at 504 (finding that while FELA applies to "commuter railroads" regardless of whether they operate interstate or intrastate, because the New York City Transit Authority carries only passengers, it is not a common carrier railroad engaged in interstate commerce).

## III. INTEGRATION WITH RAILROADS

"A *de minimis* relationship to the operation of a railroad is insufficient to trigger … FELA." *Felton*, 757 F. Supp. at 631. For example, in *Felton*, the court considered whether the city transit division of the Southeastern Pennsylvania Transportation Authority (SEPTA) that operated an urban rapid transit system was covered by FELA because SEPTA, through its regional rail division, operated a common carrier by railroad. *Id.* at 627–32. The plaintiff argued that because a single access track connected "subway rails carrying [c]ity [t]ransit [d]ivision cars to a track used by the [r]egional [r]ail lines," the city transit division was a "common carrier by railroad." *Id.* at 631. The court disagreed, finding, in part, that because "SEPTA's subway cars and regional rail trains … require[d] different voltages and rel[ied] on different power sources" such that they could not run on the same tracks, the two divisions were more separate than integrated. *Id.* at 631–32. In other words, "[t]o succeed on this integration theory, [the] plaintiff must [have] demonstrate[d] that SEPTA's entire operation, including its [c]ity [t]ransit [d]ivision, [wa]s a

'common carrier by railroad.'"  *Id.* at 630 (quoting *Lone Star Steel Co. v. McGee*, 380 F.2d 640, 647 (5th Cir. 1967)).

Here, plaintiff argues that because "one can board a PATCO train, connect to other rail carriers and even reach airports from which the PATCO-originating rider can travel the world, without travelling across a street in an ordinary surface car or other automobile like, non-rail transportation," PATCO's connections with New Jersey Transit and SEPTA demonstrates that it is a common carrier railroad.  (ECF No. 66 p. 37.)  I, however, find that these connections are not physically integrated.  *See Felton*, 952 F.2d at 64. Instead, to access the other transit systems, a PATCO passenger must exit the PATCO facility or use a different platform and pay a separate fare.[4]  (ECF No. 60–4 ¶ 44; ECF No. 60–5 pp. 9, 15, 18, 21; ECF No. 60–6 p. 14.)  Furthermore, a PATCO car cannot operate on a standard railroad track built for steam or diesel railcars, nor can a steam or diesel railcar operate on PATCO's tracks. (ECF No. 40–4 ¶¶ 16, 17.)  This is both due to the power source as well as trackage clearance requirements.  (*Id.* ¶¶ 16–20.)[5]  Accordingly, PATCO's connections with other transit systems does not transform it into a common carrier by railroad.

---

[4] For example, a PATCO passenger wishing to connect to the SEPTA at the 9th/10th and Locust PATCO facility must exit the railcar, climb two sets of stairs, exit the PATCO facility, and then walk five blocks to access SEPTA's Market-Frankford or Broad Street lines, before going down a series of stairs to pay the SEPTA fare and enter the subway platform.  (ECF No. 60–5 p. 18; ECF No. 60–6 p. 14.)  Similarly, to access the transit lines available at the Walter Rand Transportation Center, a PATCO passenger must go up a set of stairs, exit the PATCO facility, walk up to street level, and pay a separate fare.  (ECF No. 60–5 p. 21.)  As to the connection with New Jersey Transit at the Lindenwold facility, the PATCO platform is elevated about 20 feet above the New Jersey transit platform and fares must be purchased at separate kiosks.  (*Id.* pp. 9, 15; ECF No. 60–4 ¶ 44.)

[5] PATCO runs on a closed electric circuit.  (ECF No. 60–4 ¶ 42.)  The electric power is from a covered third rail.  (*Id.* ¶ 10.)  Its power is sourced from the commercial power grid from PECO in Philadelphia and PSE&G in New Jersey.  (*Id.* ¶ 11.)

9

## IV. AGENCIES' CHARACTERIZATIONS OF PATCO

Several federal agencies have declined to exercise jurisdiction over PATCO's operations. (*See* ECF Nos. 60–9, 60–10, 60–11.) For example, in 1965, the Interstate Commerce Commission (ICC), issued an order in response to the DRPA's application to extend the Bridge Line. (ECF No. 60–9 p.2.) The ICC found that "the railroad properties … and the proposed extension constitute an interurban electric railway … within the meaning of that term as used in [S]ection 1(22) of the Interstate Commerce Act." (*Id.* p.3.) In 1975, the ICC confirmed this characterization. (ECF No. 60–10 p.6.) Of note, the ICC's determination was in contemplation of expanding PATCO to its current extension. (ECF No. 60–9.) While the Interstate Commerce Act was replaced with the ICC Termination Act in 1995,[6] this ruling has not been overturned. (ECF No. 60–10 p.6.)

Similarly, in 2017, the Railroad Retirement Board determined that "PATCO is a street, interurban, or suburban electric railway." (ECF No. 60–10 p.7.) It found that "PATCO is not a covered employer within the meaning of Section 1(a)(1) of the Railroad Retirement Act and Section 1 of the Railroad Unemployment Insurance Act." (*Id.*) While plaintiff raises concerns about PATCO having mislead the Railroad Retirement Board (ECF No. 66 p.43), I will not speculate on what information the Railroad Retirement Board had at the time of its ruling and how this information should or should not have factored into the agency's determination.

---

[6] The purpose of the ICC Termination Act was, at least in part, to "limit[] state regulation of interstate rail transportation." *City of Ozark v. Union Pac. R.R. Co.*, 843 F.3d 1167, 1170 (8th Cir. 2016).

## CONCLUSION

In considering PATCO's operations, lack of connections to another rail system, and its similarity to other urban rapid transit systems, I conclude PATCO is an urban rapid transit system that is not subject to FELA. PATCO's history and the Third Circuit's determination that the Bridge Line was not covered by FELA, moreover favors a consistent result here. While PATCO has expanded since its first iteration as the Bridge Line, it continues to be a rapid transport system for passengers in the Philadelphia/Camden urban and suburban areas.

PATCO is not subject to FELA and this Court lacks subject matter jurisdiction. The Motion will be granted and this matter will be dismissed. An appropriate order accompanies this opinion.

*/s/ Edward S. Kiel*
**EDWARD S. KIEL**
**UNITED STATES DISTRICT JUDGE**

Dated: July 25, 2024